*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CHARLES C. GABBARD,

        *Petitioner,*

    *v.*

FEDERAL AVIATION ADMINISTRATION and THE
NATIONAL TRANSPORTATION SAFETY BOARD,

        *Respondents.*

No. 07-3977

On Petition for Review of an Order
of the National Transportation Safety Board.
No. SE-18008.

Argued: April 29, 2008

Decided and Filed: June 19, 2008

Before: BATCHELDER and SUTTON, Circuit Judges; BARZILAY, Judge.[*]

---

**COUNSEL**

**ARGUED:** Charles W. Arnold, ARNOLD & COWAN, Lexington, Kentucky, for Petitioner. Agnes M. Rodriguez, FEDERAL AVIATION ADMINISTRATION, OFFICE OF THE CHIEF COUNSEL, Washington, D.C., for Respondents. **ON BRIEF:** Charles W. Arnold, ARNOLD & COWAN, Lexington, Kentucky, for Petitioner. Agnes M. Rodriguez, FEDERAL AVIATION ADMINISTRATION, OFFICE OF THE CHIEF COUNSEL, Washington, D.C., for Respondents.

---

**OPINION**

---

    SUTTON, Circuit Judge. The Federal Aviation Administration (FAA) revoked Charles Gabbard's airman and medical certificates after he failed a drug test and after the FAA concluded that he piloted a chartered jet with a prohibited drug in his system. Because Gabbard has not shown that the agency's decision was arbitrary, capricious or otherwise not in accordance with the law, we deny his petition.

---

[*]The Honorable Judith M. Barzilay, Judge of the United States Court of International Trade, sitting by designation.

I.

On February 16, 2007, at 1:05 p.m., Gabbard, a commercial pilot, submitted to a random drug test under his employer's FAA-mandated drug-testing policy. On February 17, at 1:10 p.m., he flew a chartered jet. And on February 21, the test results came back, showing he had tested positive for cocaine metabolites.

In April 2007, based on Gabbard's positive drug test and its conclusion that Gabbard had piloted the February 17 flight "while having a prohibited drug, cocaine, in [his] system," the FAA issued an emergency order revoking Gabbard's pilot and related licenses. JA 38. After an evidentiary hearing, the ALJ affirmed the FAA's decision. The National Transportation Safety Board also affirmed.

II.

Federal aviation regulations prohibit a person from performing a safety-sensitive function "while that person has a prohibited drug, as defined [in Appendix I to Part 121 of this chapter], in his or her system." 14 C.F.R. § 135.249(b). Appendix I to Part 121 states that "[p]rohibited drug means marijuana, cocaine . . . and amphetamines, as specified in 49 CFR 40.85." *Id.* pt. 121 app. I. And 49 C.F.R. § 40.85 refers to "five *drugs* or classes *of drugs*," including "[c]ocaine metabolites." (emphases added). Taken together, these regulations permit the FAA to revoke a pilot's airman certificate if he flew a chartered jet with cocaine metabolites in his system, *see* 14 C.F.R. § 135.249(b); 49 U.S.C. §§ 44709, 46105, and to revoke a pilot's medical certificate (needed to show he is physically able to fly a plane) based solely on a failed drug test, *see* 14 C.F.R. § 67.107(b)(2); 49 U.S.C. §§ 44709, 46105.

In challenging the FAA's revocation of his airman certificates (his pilot's license, flight-instructor's license and ground-instructor's license), Gabbard first argues that the FAA did not adequately show that he had cocaine metabolites in his system when he piloted the February 17 flight. We disagree because "substantial evidence"—evidence that "a reasonable mind might accept as adequate to support a conclusion," *Kratt v. Garvey*, 342 F.3d 475, 480 (6th Cir. 2003) (internal quotation marks omitted)—supports the Board's decision.

The FAA presented the following evidence to the ALJ: Gabbard admittedly smoked crack cocaine sometime between 5:00 p.m. and 7:00 p.m. on February 15. Gabbard's urine sample, taken at 1:05 p.m. on February 16, showed that his cocaine-metabolite level was 2,054 nanograms per milliliter, nearly seven times the regulatory limit of 300 nanograms per milliliter and over thirteen times the confirmation threshold of 150 nanograms per milliliter. *See* 49 C.F.R. § 40.87. Gabbard flew a chartered jet at 1:10 p.m. on February 17. And, according to the report of the third party that tested Gabbard, the "main urinary [cocaine] metabolite . . . is normally cleared from the urine in 24–48 hours." JA 102. On top of this, the ALJ reasonably found Gabbard not credible, raising questions about how and when Gabbard ingested the cocaine. Based on this evidence and finding, the Board "agree[d] . . . that it was more likely than not that cocaine metabolites were present in [his] system, in violation of § 135.249(b)." JA 9.

In view of this evidence, "a reasonable mind" could find that Gabbard piloted a chartered jet with cocaine metabolites in his system. In particular: an adverse-credibility finding undermines Gabbard's explanation of when and why he consumed the cocaine; and the uncontested evidence that remained showed that Gabbard piloted a chartered jet (at most) 42 to 44 hours after smoking crack cocaine—within the 24-to-48-hour window that it "normally" takes for cocaine metabolites to leave a person's system—and that Gabbard still had a substantial amount of cocaine metabolites in his system 24 hours before the flight.

In challenging this conclusion, Gabbard emphasizes that the FAA failed to present an expert to testify that, based on the facts of this case and on the rate at which crack cocaine metabolizes within, and eventually exits, a person's body, Gabbard still had cocaine metabolites in his system when he piloted the February 17 flight. We have some sympathy for his point. At the same time that the FAA forcefully argued in this case about the perils of mixing pilots with cocaine—and, as here, of mixing pilot *instructors* with cocaine—it chose not to take the basic step of putting on a medical expert at the evidentiary hearing to support its position. It thus did not introduce any expert testimony saying that a test of 2,054 nanograms per milliliter of cocaine metabolites 24 hours before a flight shows that the pilot in all probability still would have had the requisite 300 nanograms per milliliter of cocaine metabolites in his system at the time of the flight. An agency insistent on addressing the one concern, it seems to us, would be equally insistent on proving the other. The problem for Gabbard, however, is that he did not make any meaningful effort to deal with the issue either: He did not object to the laboratory report that contained the metabolic rate for cocaine; although the FAA filed the required pre-hearing submission providing notice that, among other things, the agency intended to call an expert witness, Gabbard did not file any pre-hearing submission and did not notify the agency that he intended to call any expert witness; Gabbard did not introduce any expert testimony himself; and he has not pointed to any *requirement* that the agency present such evidence. That leaves us with a conspicuously high cocaine-metabolite test result 24 hours before the flight, no competing evidence from Gabbard and a lack-of-credibility finding with respect to Gabbard's testimony, the latter of which suggests that he may have consumed more cocaine than he admitted and done so closer to the flight than he testified. In the context of these facts, substantial evidence still supports the agency's decision.

Gabbard next argues that the Board failed to treat "inadvertent ingestion of cocaine as a legitimate medical explanation" for the test result. Br. at 13. But he failed to present this argument to the Board, which by itself defeats the argument here. *See* 49 U.S.C. § 1153(b)(4) ("In reviewing an order under this subsection, the court may consider an objection to an order of the Board only if the objection was made in the proceeding conducted by the Board or if there was a reasonable ground for not making the objection in the proceeding."); *id.* § 46110(d) (same).

The relevant regulations, at all events, defeat his argument. While the regulations require medical review officers—physicians responsible for receiving and reviewing laboratory results generated by an employer's drug-testing program—to consider "legitimate medical explanations" for positive test results, *see* 49 C.F.R. § 40.137(b), they define "legitimate" explanations restrictively. Of particular relevance, the regulations prohibit medical review officers from

> consider[ing] explanations of confirmed positive . . . test results that would not, even if true, constitute a legitimate medical explanation. For example, an employee may tell [review officers] that someone slipped amphetamines into her drink at a party [or] that she unknowingly ingested a marijuana brownie . . . . MROs are unlikely to be able to verify the facts of such passive or unknowing ingestion stories. Even if true, *such stories do not present a legitimate medical explanation.* Consequently, [review officers] must not declare a test as negative based on an explanation of this kind.

*Id.* § 40.151(d) (emphasis added). Based on this regulation, Gabbard's explanation—that he smoked a cigarette that he did not know was laced with cocaine until after a couple puffs—is not a "legitimate medical explanation." *See Blakey v. Kalberg*, NTSB Order No. EA-5240, 2006 WL 2332760, at *3 (2006) (addressing a similar explanation and stating that, in view of 49 C.F.R. § 40.151(d), "it is doubtful whether respondent's exculpatory claims, even if believed, would establish a legally sufficient defense to operational violations").

That is not all. Even if Gabbard had preserved this argument, and even if inadvertent ingestion constituted a legitimate medical explanation, he still would come up short because the ALJ and the Board had ample bases for "find[ing] [Gabbard] not . . . credible," JA 21, and thus for rejecting his explanation on that ground. Unlike a pilot who unknowingly ingests a drug and learns *after* flying a plane what he had consumed, Gabbard knew that he had ingested cocaine immediately after he took a couple puffs from the cocaine-laced cigarette. Yet he chose not to report that fact to his employer, and, making matters worse, he flew a chartered jet less than two days later and subsequently suggested to the medical review officer that the cocaine may have come from plastic surgery or from being around others who were smoking cocaine.

Under these circumstances, even if Gabbard is correct that "principles of justice must provide that one who commits any act inadvertently not effectively receive a professional death penalty for it," Br. at 16, he has not demonstrated eligibility for relief based on those "principles." He may have smoked crack cocaine inadvertently, but he did not fly the jet inadvertently or do so without the knowledge that he had recently smoked crack cocaine. Nor did he inadvertently misrepresent to the medical review officer the potential source of the cocaine metabolites found in his system. The Board thus correctly found Gabbard not credible and rejected his inadvertent-ingestion argument.

There is not much to say about Gabbard's final contention—that he was denied effective assistance of counsel at his hearing before the ALJ in violation of the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). For "there is no constitutional right to counsel in a *civil* case." *Perkins v. MBNA Am.*, 43 F. App'x 901, 902 (6th Cir. Aug. 8, 2002) (per curiam) (emphasis added); *see also* U.S. Const. amend. VI (providing a right to the assistance of counsel "[i]n all *criminal* prosecutions") (emphasis added); *Lanier v. Bryant*, 332 F.3d 999, 1006 (6th Cir. 2003).

III.

For these reasons, we deny the petition.